[No. H031019. Sixth Dist. Sept. 21, 2009.]

BRUCE TICHININ et al., Plaintiffs and Appellants, v.
CITY OF MORGAN HILL, Defendant and Respondent.

**COUNSEL**

Mesirow & Fink, Steven M. Fink; Law Offices of Bruce Tichinin and Bruce Tichinin for Plaintiffs and Appellants.

Burton, Volkmann & Schmal, Timothy J. Schmal and Burleigh E. Sabin for Defendant and Respondent.

**OPINION**

**RUSHING, P. J.—**

### I. STATEMENT OF THE CASE

In 2004, the Morgan Hill City Council adopted a resolution that condemned Bruce Tichinin, a local attorney, for hiring a private investigator to conduct surveillance of the city manager and then denying that he had done so. Thereafter, Tichinin filed an action against the city under 42 United States Code section 1983 (hereafter 1983 action) alleging that the city unlawfully retaliated against him for exercising his constitutional rights. The city answered and then filed an anti-SLAPP motion under Code of Civil Procedure section 425.16 to strike the action.[1] (*Bradbury v. Superior Court* (1996) 49

---

[1] "SLAPP is an acronym for strategic lawsuit against public participation." (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1329, fn. 3 [93 Cal.Rptr.3d 782].)

Cal.App.4th 1108, 1117–1118 [57 Cal.Rptr.2d 207] [§ 425.16 applies to federal claims under 42 U.S.C. § 1983]; accord, *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1392, fn. 4 [53 Cal.Rptr.3d 647].) After a hearing, the trial court granted the anti-SLAPP motion, struck the amended complaint, awarded the city attorney fees, and entered judgment.

On appeal, Tichinin claims the court erred in granting the motion.

We agree and reverse the judgment.

## II. BACKGROUND

In 2002, a rumor circulated in the City of Morgan Hill (City) that J. Edward Tewes (Tewes), the city manager, and Helene Leichter (Leichter), the city attorney, were having a romantic affair. Hedy Chang (Chang), a member of the city council (Council), believed they were having an inappropriate relationship and made her views known to other members of the Council. As a result, Leichter threatened to sue the City and Chang. In June 2003, Chang retained Tichinin and reiterated her belief about Tewes and Leichter.

At this time, Tichinin also represented two clients in matters before the Council. On behalf of Bob Lynch Ford and Scott Lynch, Tichinin opposed an application by Timothy Paulus to establish a new Ford dealership in the City. That opposition was rejected, and the City approved the application. Thereafter, Tichinin filed an action against Paulus and the City challenging the approval.[2]

---

Code of Civil Procedure section 425.16 is called the anti-SLAPP statute and allows a defendant to gain early dismissal of SLAPP actions designed primarily to chill the exercise of First Amendment rights. (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1568 [31 Cal.Rptr.3d 368]; *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1069–1070 [112 Cal.Rptr.2d 397].) In pertinent part, the statute provides, "A cause of action against a person arising from any act of that person *in furtherance of the person's right of petition or free speech* under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike . . . ." (Code Civ. Proc., § 425.16, subd. (b)(1), italics added.)

Acts " 'in furtherance of' " these rights include "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e).)

All further unspecified statutory references are to the Code of Civil Procedure.

[2] In that action, Paulus prevailed and then sued Bob Lynch Ford for malicious prosecution. Bob Lynch Ford filed an anti-SLAPP motion to dismiss Paulus's action, which the trial court

Tichinin also represented Howard Vierra, a residential developer, seeking approval for a proposed residential project at the base of El Toro Peak.[3] In November 2003, the City Planning Department (the Department) rejected Vierra's application. Based on Leichter's analysis and advice, the Department found that the project was inconsistent with the general plan because it was located in an area designated for open space on the general plan map. In December 2003, Tichinin appealed to the Council.

According to Tichinin, before the hearing on that appeal, he called Leichter to explain that the appeal was based on a claim that the open space areas on the general plan map had been misdrawn; and in response, Leichter said she would advise the Council that his position was " 'reasonable.' " At a subsequent informal meeting attended by Tichinin, Tewes, Leichter, and members of the planning staff, Tewes said he was opposed to the Vierra project. Later, at the hearing, Leichter supported the Department's initial determination but recommended that the Council file a declaratory relief action to have the court determine whether the project was inconsistent with the general plan. The Council adopted that recommendation.

After the hearing, Tichinin suspected that Tewes had been able to influence Leichter to change her view that Vierra's appeal was reasonable because they were having an affair. When he relayed this to Vierra, Vierra authorized him to hire a private investigator to determine whether there was an inappropriate relationship. According to Tichinin, if the investigation uncovered evidence of an affair, he intended to discreetly tell the Council, request that Leichter be removed from further involvement with the Vierra project due to a conflict of interest, and have the City appoint independent counsel to prosecute the action for declaratory relief. If the Council declined to disqualify Leichter, then Tichinin intended to sue the City for unlawful retaliation based on his belief that Tewes had turned Leichter against the Vierra project because Tichinin was representing Councilmember Chang and had previously opposed the Paulus car dealership, which Tewes had favored.

At the end of January 2004, Tichinin hired Mark Bell, a licensed private investigator, to watch Tewes at an official conference he was planning to attend in Huntington Beach on February 3, 2004.

Before leaving for the conference, Tewes had a meeting with Tichinin, Vierra, and Leichter. Tichinin and Vierra said they wanted the Council to reconsider the Vierra project, reiterating their view that the general plan map

---

granted and which later became the subject of this court's opinion in *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659 [43 Cal.Rptr.3d 148] (*Paulus*).

[3] In exchange for his services, Vierra offered, and Tichinin accepted, an interest in the project.

had been misdrawn. Vierra asked what it would take to get Tewes and Leichter to see it his way or get them on his side. When Tewes and Leichter demurred, Tichinin accused them of opposing the Vierra project because of his previous opposition to the Paulus Ford dealership. Leichter asked if he was threatening to file a 1983 action. Vierra said, " 'That's not what I want!' "

After the meeting, Tewes went to Huntington Beach and checked into the Hyatt Regency Hotel. Meanwhile, Bell had hired Brian Carey, who reserved a room at the hotel in order to conduct surveillance. In his declaration, Tewes said that on February 5, he returned to his room and found hot chocolate for two, which he had not ordered. He thought that someone might have entered his room and ordered it, which made him anxious. It was Carey who had ordered the hot chocolate. The next day, based on information he learned from hotel personnel, Tewes suspected that someone was stalking him and became worried and alarmed. He received an anonymous call asking for some other person, which added to his suspicion. Then, before checking out, Tewes made a lot of noise in his room as he left. He hid in the hallway and waited. Within moments, Carey came walking by with a video camera. Seeing Tewes, Carey diverted the camera and then continued walking to the lobby. Tewes followed him. Later, outside the hotel, he saw Carey watching him from a distance. In his declaration, Tewes said he was shaken and distressed by what he considered to be intrusive surveillance, and he feared for his family.

Tewes reported the surveillance to the Council, which appointed Councilmembers Greg Sellars and Larry Carr as a surveillance subcommittee to investigate. They, in turn, hired Kelly Jones, a private investigator, to find out who had been watching Tewes.

Between February and May 2004, Bell called Tichinin to report that the City was talking to Carey about who had hired him. In April 2004, the City prepared a complaint against Carey for stalking that sought a restraining order. At that point, Tichinin became concerned about possible action against him if the City learned that he had hired Bell. On May 8, 2004, Sellars asked Tichinin if he had been involved in the surveillance, but Tichinin said no. However, on May 14, he admitted his involvement. He explained that he was investigating the rumored relationship between Tewes and Leichter because he thought it would explain why Leichter had opposed the Vierra project and support a request to have Leichter removed from further involvement on the project. According to Sellars, Tichinin apologized and said that he had not acted for Chang but for another client.

In early July 2004, the surveillance subcommittee issued its final report, which was based on interviews and conversations with Tewes, Jones, Leichter,

Chang, and Tichinin and public documents. At a Council meeting on July 7, 2004, the Council adopted the subcommittee report and scheduled a follow-up meeting for July 14 to consider taking punitive action against Tichinin.

At the meeting on July 14, Chang apologized for knowing about the surveillance, misleading the Council about it, and costing taxpayers the expense of the investigation. She also apologized for any discomfort that the surveillance had caused Tewes.

Steven Fink, Tichinin's attorney, argued that Tichinin was investigating a matter of public concern in that an affair between Tewes and Leichter would create a potential conflict of interest. Fink further argued that before taking any formal action on behalf of his clients based on such a conflict of interest, Tichinin had a duty to investigate whether there was, in fact, an inappropriate relationship. Accordingly, he argued that hiring an investigator was both lawful and constitutionally protected conduct, for which he could not be punished. Fink conceded that Tichinin was wrong to falsely deny involvement in the surveillance, but he argued that that was a different matter, and Tichinin was prepared to explain and apologize for having done so.

Tichinin also spoke. He apologized for lying, saying that Sellars had caught him "flatfooted," he felt "trapped," and he "feared that giving no answer would tend to compromise the confidentiality of the investigation, the confidentiality of the client that I had done it on behalf of, and so I misrepresented. I also feared that if I told the truth that the City would retaliate . . . ."

Tichinin reiterated the view that his opposition to the Paulus Ford dealership and subsequent court challenge to its approval had angered Tewes; and that later, when he appealed the Department's rejection of the Vierra project, Tewes still held a grudge and retaliated against him by persuading Leichter, whom he was having an affair with, to change her views on the merits of Vierra's appeal and oppose it. Given his suspicions, he hired Bell to investigate whether there was an inappropriate relationship. He reasoned that if there was evidence of an affair, he could establish a conflict of interest and convince the Council to rehear the appeal based on objective and independent advice concerning whether the Vierra project was consistent with the general plan.

At the end of the hearing, the Council adopted a resolution that provided, in relevant part, "NOW, THEREFORE, BE IT RESOLVED the City Council condemns the surveillance activities of Mr. Bruce Tichinin and finds them unwarranted and unjustified. The City Council deplores the false statements that he made to City Council members to avoid disclosure of the surveillance.

The City Council requests Mr. Tichinin's immediate resignation from the Morgan Hill Urban Limit Line Subcommittee."

Thereafter, the Council adopted its resolution, Tichinin filed his 1983 action, and the City parried with an anti-SLAPP motion, which the court granted.

## III. STANDARD OF REVIEW

■ The anti-SLAPP statute allows a defendant to gain early dismissal of a SLAPP suit. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056 [39 Cal.Rptr.3d 516, 128 P.3d 713].) The statute reflects the legislative recognition that SLAPP suit plaintiffs are not seeking to succeed on the merits but to use the legal system to chill the defendant's First Amendment rights.[4] (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 522 [44 Cal.Rptr.3d 517].)

■ In ruling on an anti-SLAPP motion, the trial court engages in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685] (*Equilon*); accord, *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [3 Cal.Rptr.3d 636,

---

[4] Section 425.16 provides, in relevant part, "(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. [¶] . . . [¶] (e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

74 P.3d 737].) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703], original italics.)

On appeal, we review the motion de novo and independently determine whether the parties have met their respective burdens. (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 79 [55 Cal.Rptr.3d 600]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103 [15 Cal.Rptr.3d 215].) In evaluating the motion, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we do not weigh credibility or compare the weight of the evidence. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 [46 Cal.Rptr.3d 638, 139 P.3d 30].) Rather, we accept as true evidence favorable to the plaintiff, determine whether the plaintiff has made a prima facie showing of facts necessary to establish its claim at trial, and evaluate the defendant's evidence only to determine whether it defeats that submitted by the plaintiff as a matter of law. (*Ibid.*; *Paulus, supra*, 139 Cal.App.4th at p. 673.)

## IV. DISCUSSION

The two fundamental issues are whether Tichinin's 1983 action was based on activity by the City that qualified for protection under the anti-SLAPP statute; and if so, whether Tichinin made a prima facie showing of facts that would support judgment in his favor. (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89.)

### A. *The Basis of the Action*

Tichinin concedes that his action is based on acts by the City that would qualify for protection under the anti-SLAPP statute. We agree.

■ The anti-SLAPP statute applies to acts taken "in furtherance of the person's right of petition or free speech" as defined in section 425.16, subdivision (e). (§ 425.16, subd. (b)(1).) Section 425.16, subdivision (e) defines acts in furtherance of the rights of petition and free speech to include "any written or oral statement or writing" made before a legislative, executive, or judicial body, or any other official proceeding authorized by law, or in connection with an issue under consideration or review by such bodies or officials. (§ 425.16, subd. (e)(1), (2).) Tichinin's claims are based on the investigative reports by the Council's surveillance subcommittee, the Council's hearing, and subsequent resolution adopted by the Council condemning him.

## B. *Probability of Success*

█ "In order to establish a probability of prevailing on the claim [citation], a plaintiff responding to an anti-SLAPP motion must ' "state . . . and substantiate[] a legally sufficient claim." ' [Citation.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)

In determining whether a plaintiff has shown a probability of prevailing on the merits, we employ a standard "similar to that employed in determining nonsuit, directed verdict or summary judgment motions. [Citation.]" (*Paulus, supra*, 139 Cal.App.4th at p. 672.) However, "[a] motion to strike under section 425.16 is not a substitute for a motion for a demurrer or summary judgment [citation]. In resisting such a motion, the plaintiff need not produce evidence that he or she can recover on every possible point urged. It is enough that the plaintiff demonstrates that the suit is viable, so that the court should deny the special motion to strike and allow the case to go forward." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 905 [17 Cal.Rptr.3d 497].)

█ In general, to succeed on his 1983 action, Tichinin had to prove that (1) the conduct he complained of was committed by a person "acting under color of state law"; and (2) "this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."[5] (*Paraatt v. Taylor* (1981) 451 U.S. 527, 535 [68 L.Ed.2d 420, 101 S.Ct. 1908], overruled on other grounds in *Daniels v. Williams* (1986) 474 U.S. 327, 330–331 [88 L.Ed.2d 662, 106 S.Ct. 662]; see *American Mfrs. Mut. Ins. v. Sullivan* (1999) 526 U.S. 40, 49–50 [143 L.Ed.2d 130, 119 S.Ct. 977]; *Vergos v. McNeal, supra*, 146 Cal.App.4th at p. 1402.)

█ Where, as here, the plaintiff claims retaliation for exercising a constitutional right, the majority of federal courts require the plaintiff to prove that (1) he or she was engaged in constitutionally protected activity, (2) the defendant's retaliatory action caused the plaintiff to suffer an injury that would likely deter a person of ordinary firmness from engaging in that

---

[5] Section 1983 of 42 United States Code provides, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

protected activity, and (3) the retaliatory action was motivated, at least in part, by the plaintiff's protected activity. (*Espinal v. Goord* (2d Cir. 2009) 554 F.3d 216, 228–229; *Lauren W. ex rel. Jean W. v. DeFlaminis* (3d Cir. 2007) 480 F.3d 259, 267; *Suarez Corp. Industries v. McGraw* (4th Cir. 2000) 202 F.3d 676, 686; *Keenan v. Tejeda* (5th Cir. 2002) 290 F.3d 252, 258; *Bloch v. Ribar* (6th Cir. 1998) 156 F.3d 673, 678; *Bridges v. Gilbert* (7th Cir. 2009) 557 F.3d 541, 546, 552; *Carroll v. Pfeffer* (8th Cir. 2001) 262 F.3d 847, 850; *Mendocino Environmental Center v. Mendocino County* (9th Cir. 1999) 192 F.3d 1283, 1300–1301; *Smith v. Plati* (10th Cir. 2001) 258 F.3d 1167, 1176; *Bennett v. Hendrix* (11th Cir. 2005) 423 F.3d 1247, 1251.)

### 1. *Color of State Law*

■ "The traditional definition of acting under color of state law requires that the defendant in a [section] 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' [Citations.]" (*West v. Atkins* (1988) 487 U.S. 42, 49 [101 L.Ed.2d 40, 108 S.Ct. 2250], quoting *United States v. Classic* (1941) 313 U.S. 299, 326 [85 L.Ed. 1368, 61 S.Ct. 1031]; accord, *Lugar v. Edmondson Oil Co.* (1982) 457 U.S. 922, 928 & fn. 8, 929 & fn. 13 [73 L.Ed.2d 482, 102 S.Ct. 2744].)

The City concedes that the acts underlying Tichinin's claims were performed under color of state law and, therefore, that Tichinin can establish this element of his 1983 claim. We agree. It is undisputed that in preparing and issuing the surveillance reports and adopting the resolution condemning Tichinin, the Council and its subcommittee were clothed with the authority of state law and exercised power that they possess by virtue of state law.

### 2. *Deprivation of Rights*

We focus now on whether Tichinin made a prima facie showing that (1) he was engaged in constitutionally protected conduct, (2) the City's actions would deter or chill a person of ordinary firmness from engaging in that protected conduct, and (3) the City's actions were motivated, at least in part, by Tichinin's protected conduct.

### a. *Constitutionally Protected Conduct*

In his complaint, Tichinin alleged that hiring a private investigator and investigating the rumored inappropriate relationship between Tewes and Leichter were protected under his First Amendment rights of petition and free speech.[6]

### i. *The Right of Petition*

In determining whether Tichinin can show that his conduct was protected under the right to petition, we find guidance in cases that discuss that right in the context of determining the applicability of the *Noerr-Pennington* doctrine.[7] (See *Pratt v. Union Pacific Railroad Co.* (2008) 168 Cal.App.4th 165, 178 [85 Cal.Rptr.3d 321] [guidance from federal cases].)

▆▆ The *Noerr-Pennington* doctrine is a broad rule of statutory construction, under which laws are construed so as to avoid burdening the constitutional right to petition. (*Sosa v. DIRECTV, Inc.* (9th Cir. 2006) 437 F.3d 923,

---

[6] The First Amendment to the United States Constitution provides in part: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances."

Tichinin's complaint asserts separate causes of action for violating the right to petition and the right of free speech. Although each cause of action alleges numerous protected acts, both include the hiring of an investigator and his investigation as protected conduct.

We further note that concerning whether Tichinin engaged in protected conduct, the primary focus of the anti-SLAPP motion—i.e., the pleadings, hearing, and the court's ruling—was the hiring of the investigator. On appeal, that conduct continues to be the parties' primary focus. Accordingly, we too focus on whether Tichinin's investigation of Tewes's alleged relationship was protected conduct.

[7] In *Eastern R. Conf. v. Noerr Motors* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523] (*Noerr*), trucking companies sued railroad companies claiming their efforts to influence legislation regulating trucking violated the Sherman Act (15 U.S.C. § 1 et seq.). (365 U.S. at p. 129.) The court held that the Sherman Act did not bar people from associating to persuade the government to take particular action. (365 U.S. at pp. 136–137.) In reaching this conclusion, the court opined that construing the Sherman Act to reach such conduct "would raise important constitutional questions" concerning the right of petition and then stated, "we cannot . . . lightly impute to Congress an intent to invade . . . freedoms" protected by the Bill of Rights. (365 U.S. at p. 138.)

In *Mine Workers v. Pennington* (1965) 381 U.S. 657 [14 L.Ed.2d 626, 85 S.Ct. 1585] (*Pennington*), the court extended this antitrust immunity to those engaging in lobbying activities directed toward executive branch officials, regardless of any anticompetitive intent or purpose.

Many of the *Noerr-Pennington* cases are decisions from lower federal appellate and district courts. "While we are not bound by decisions of the lower federal courts, even on federal questions, they are persuasive and entitled to great weight." (*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 320 [93 Cal.Rptr.2d 36, 993 P.2d 366]; accord, *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58 [51 Cal.Rptr.3d 55, 146 P.3d 510].) This can be especially so when they bear a marked factual similarity to the case before us. (*Wells Fargo Bank, N.A. v. Superior Court* (2008) 159 Cal.App.4th 381, 390 [71 Cal.Rptr.3d 506].)

929–931 (*Sosa*) [discussing the development and expansion of the doctrine].) In effect, the doctrine immunizes conduct encompassed by the petition clause—i.e., legitimate efforts to influence a branch of government—from virtually all forms of civil liability. (See *People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 964–965 [70 Cal.Rptr.3d 501] [discussing the doctrine and its expansive application].) Thus, *Noerr-Pennington* cases are pertinent because in deciding whether the doctrine applies, a court must first determine whether conduct falls within the right to petition. (See, e.g., *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 21–22 & fn. 17 [43 Cal.Rptr.2d 350] [using the doctrine to determine whether SLAPP plaintiff established probability of success]; *Tarpley v. Keistler* (7th Cir. 1999) 188 F.3d 788, 794–95 [using the doctrine to determine whether conduct was subject to liability under 42 U.S.C. § 1983].)

■ In *Freeman v. Lasky, Haas & Cohler* (9th Cir. 2005) 410 F.3d 1180 (*Freeman*), the issue was whether discovery conduct by a party in a civil action was protected by the right to petition and subject to the *Noerr-Pennington* doctrine. The court explained in the context of litigation, the right to petition covers pleadings in which a party requests some action by the court. (*Id.* at p. 1184.) The court opined that because discovery involved communications between parties, it could not fairly be called petitioning the government. Nevertheless, the court observed that the protection for petitions extended to conduct " 'incidental to' " a petition, unless the petition itself was a sham. (*Id.* at p. 1184.)[8]

As an example of protected incidental conduct, the *Freeman* court cited *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.* (9th Cir. 1991) 944 F.2d 1525, where the court held that the plaintiffs' refusal to settle the case was protected because the decision to accept or reject a settlement offer is "incidental" to the prosecution of a lawsuit " 'and not a separate and distinct activity which might form the basis for antitrust liability.' " (*Freeman, supra*, 410 F.3d at p. 1184.) The *Freeman* court found that discovery between parties, like settlement talks, was incidental to litigation and not a separate and distinct activity. Therefore, the defendant's conduct during discovery, even if improper and sanctionable, was constitutionally protected unless the defendant's entire defense to the lawsuit was a sham. (*Id.* at p. 1185.)

---

[8] A sham petition is one that is "ostensibly directed toward influencing governmental action" but that "is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor . . . ." (*Noerr, supra*, 365 U.S. at p. 144.)

There are two elements to a sham petition. One element is objective: a petition (or litigation) must be baseless, in that no reasonable person could expect to succeed on the merits; the second element is subjective, in that the petition was subjectively motivated by a concealed wrongful purpose to use the judicial *process* itself to harm the other party. (*BE&K Constr. Co. v. NLRB* (2002) 536 U.S. 516, 526 [153 L.Ed.2d 499, 122 S.Ct. 2390].)

Here, Tichinin's conduct in hiring an investigator, like discovery or settlement talks, cannot fairly be called petitioning the government. Moreover, the investigation was not incidental to an actual petition or any existing or ongoing litigation. Rather, given the lack of evidence of an inappropriate relationship, Tichinin did not petition the Council for Leichter's removal or file a lawsuit against the City. These circumstances, however, do not preclude constitutional protection.

Pertinent here is *Sosa, supra,* 437 F.3d 923. There, the court explained conduct incidental to a petition or litigation included conduct normally and reasonably necessary to an effective exercise of the right to petition and not necessarily conduct incidental to actual litigation. In *Sosa,* DIRECTV sent thousands of letters to people, threatening to sue them for pirating its satellite television signal unless they quickly settled its claims against them. Numerous people settled, and DIRECTV did not file actions against them. However, the settlors turned around and filed a class action against DIRECTV, claiming that the demand letters violated the antiracketeering laws. The question before the court was whether DIRECTV's demand letters were protected conduct. (*Id.* at pp. 925–926, 933.)

The court noted that the protection of First Amendment rights encompassed a "breathing space" necessary for the effective exercise of those rights. (*Sosa, supra,* 437 F.3d at pp. 932–933.) The concept of a protected "breathing space" had two aspects: overprotection and collateral protection. For example, in defamation actions against public officials, constitutional considerations require that a false statement be uttered with malice. Thus, although false statements may not seem worthy of constitutional protection, the malice requirement provides protection for some false statements. This purposefully overbroad protection "is necessary 'to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise.' [Citation.]" (*Id.* at p. 933, quoting *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 342 [41 L.Ed.2d 789, 94 S.Ct. 2997].)

 Similarly, in the right-to-petition context, the sham exception requires proof that a petition (or court pleading) is objectively baseless *and* motivated by an improper anticompetitive purpose. (See fn. 8, *ante.*) Thus, just as the malice requirement in certain defamation actions protects some false statements to ensure that the right of free speech remains robust and unfettered, so too the improper-motive requirement of the sham exception protects some baseless petitions in order to ensure that citizens may enjoy the right to petition the government through access to the courts without fear of prosecution or liability. (*Sosa, supra,* 437 F.3d at p. 934, citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* (1993) 508 U.S. 49, 60–61 [123 L.Ed.2d 611, 113 S.Ct. 1920].)

■ The second aspect of "breathing space"—collateral protection— extends protection beyond the conduct specified in the First Amendment itself. Thus, the right of free speech encompasses not only expressive speech and symbolic conduct but also nonexpressive conduct closely related to the full exercise of First Amendment rights, such as contributing money to a political campaign. (*Sosa, supra*, 437 F.3d at pp. 933–934, citing *Buckley v. Valeo* (1976) 424 U.S. 1, 17 [46 L.Ed.2d 659, 96 S.Ct. 612] and *United States v. O'Brien* (1968) 391 U.S. 367, 382 [20 L.Ed.2d 672, 88 S.Ct. 1673].) In the context of the right to petition, collateral protection has been extended to a railroad's public relations campaign aimed at influencing passage of favorable legislation (*Noerr, supra*, 365 U.S. at pp. 140–143); recommending or hiring specific lawyers to represent or advise union members (*Mine Workers v. Illinois Bar Assn.* (1967) 389 U.S. 217, 221–222 [19 L.Ed.2d 426, 88 S.Ct. 353]; *Railroad Trainmen v. Virginia Bar* (1964) 377 U.S. 1, 8 [12 L.Ed.2d 89, 84 S.Ct. 1113]); and, as discussed above, discovery conduct, and the refusal to accept a settlement offer (*Sosa, supra*, 437 F.3d at pp. 934–935).

Given this concept of a protected "breathing space," the *Sosa* court concluded that prelitigation conduct, including communications between parties, that is "sufficiently related" to what would be normal and legitimate petitioning activity was entitled to constitutional protection. The court then found that DIRECTV's demand letters were reasonably related to potential litigation and thus within protected "breathing space" unless they constituted a sham. (*Sosa, supra*, 437 F.3d at p. 935.)

The court noted that a majority of federal appellate courts had likewise concluded that prelitigation conduct reasonably related to *potential* litigation was entitled to protection. (*Sosa, supra*, 437 F.3d at p. 938; e.g., *Globetrotter Software, Inc. v. Elan Computer Group, Inc.* (Fed.Cir. 2004) 362 F.3d 1367, 1379 [communications alleging patent infringement]; *Coastal States Mktg., Inc. v. Hunt* (5th Cir. 1983) 694 F.2d 1358, 1367 [generalized threats of litigation to protect claim to oil assets]; *McGuire Oil Co. v. Mapco, Inc.* (11th Cir. 1992) 958 F.2d 1552, 1560 [concerted threats of litigation]; *A.D. Bedell Wholesale Co. v. Philip Morris Inc.* (3d Cir. 2001) 263 F.3d 239, 252–253 [settlement agreements]; *Primetime 24 Joint Venture v. Nat'l Broad. Co.* (2d Cir. 2000) 219 F.3d 92, 100 [presuit challenges to signal strength determinations by satellite broadcasters]; *Glass Equip. Dev., Inc. v. Besten, Inc.* (Fed.Cir. 1999) 174 F.3d 1337, 1343–1344 [threat of patent enforcement litigation]; *CVD, Inc. v. Raytheon Co.* (1st Cir. 1985) 769 F.2d 842, 850–851 [threat of trade secret litigation]; *Poole v. County of Otero* (10th Cir. 2001) 271 F.3d 955 [protecting letter requesting the preservation of evidence in anticipation of a possible lawsuit], abrogated on other grounds in *Hartman v. Moore* (2006) 547 U.S. 250, 256, 265–266 [164 L.Ed.2d 441, 126 S.Ct. 1695]; see *Meridian Project Systems, Inc. v. Hardin Constr. Co., LLC*

(E.D.Cal. 2005) 404 F.Supp.2d 1214, 1222 [recognizing that most courts have concluded that prelitigation communications among parties are incidental to the suit and thus immune under *Noerr-Pennington*].)[9]

The plaintiffs in *Sosa* argued that DIRECTV's demand letters did not implicate the right to petition because they were not incidental to any existing or ongoing litigation. In rejecting this argument, the court noted, for example, that the Supreme Court had protected nonpetitioning conduct that took place in the absence of some related pending litigation. (*Sosa, supra,* 437 F.3d at pp. 935–936, citing *Mine Workers v. Illinois Bar Assn., supra,* 389 U.S. at p. 222.) Indeed, the court noted that protection had been extended to the funding of litigation by people who were not parties to any litigation and thus were not themselves petitioning the government for anything. (*Sosa, supra,* 437 F.3d at p. 937; *Liberty Lake Investments, Inc. v. Magnuson* (9th Cir. 1993) 12 F.3d 155, 157–159; *Balt. Scrap Corp. v. David J. Joseph Co.* (4th Cir. 2001) 237 F.3d 394, 397–399.) The court also opined that the sham exception provided adequate protection against baseless and harassing prelitigation conduct.

We find *Sosa* and the cases it cites persuasive authority for the proposition that nonpetitioning conduct is within the protected "breathing space" of the right of petition if that conduct is (1) incidental or reasonably related to an actual petition or actual litigation or to a claim that could ripen into a petition or litigation and (2) the petition, litigation, or claim is not a sham.

In this case, the challenged prelitigation conduct involves the investigation of a possible conflict of interest due to an alleged inappropriate romantic relationship between public officials. Thus, initially we must determine whether the prelitigation investigation of a potential claim of conflict of interest between public officials can come within the protected "breathing space" of the right to petition. We conclude that it can.

When one suspects that another has caused harm, a preliminary investigation is usually necessary in order to know whether one has a potential legal

---

[9] The *Sosa* court acknowledged *Cardtoons, L.C. v. Major League Baseball Players Ass'n* (10th Cir. 2000) 208 F.3d 885, where the court held that neither the *Noerr-Pennington* doctrine nor the petition clause protected presuit cease-and-desist letters asserting trademark infringement. (*Sosa, supra,* 437 F.3d at p. 937.) However, the *Sosa* court observed that *Cardtoons* was inconsistent with the weight of authority protecting legitimate presuit litigation-related conduct. Indeed, the original panel in *Cardtoons* had come to that conclusion. (*Cardtoons, L.C. v. Major League Baseball Players Ass'n* (10th Cir. 1999) 182 F.3d 1132, 1137, reversed in *Cardtoons, L.C. v. Major League Baseball Players Ass'n, supra,* 208 F.3d 885 (en banc).) The *Sosa* court also doubted that *Cardtoons* survived subsequent Supreme Court decisions extending applicability of the *Noerr-Pennington* doctrine. (*Sosa, supra,* 437 F.3d at p. 938.)

claim, evaluate the likelihood of success, and decide whether or not to assert it. Consequently, the investigation of a potential claim is normally and reasonably part of effective litigation, if not an essential part of it. Indeed, as Tichinin correctly notes, an attorney has a duty to investigate the facts underlying a client's claims and can be sanctioned for failing to do so. (See Code Civ. Proc., § 128.7; Fed. Rules Civ.Proc., rule 11, 28 U.S.C.; *Strickland v. Washington* (1984) 466 U.S. 668, 690–691 [80 L.Ed.2d 674, 104 S.Ct. 2052] [criminal defense attorneys have constitutional obligation to perform adequate investigation]; *In re Visciotti* (1996) 14 Cal.4th 325, 348 [58 Cal.Rptr.2d 801, 926 P.2d 987] [same]; *Bakker v. Grutman* (4th Cir. 1991) 942 F.2d 236, 239–242 [in civil cases, counsel has duty to investigate case]; *Tool Research & Engineering Corp. v. Henigson* (1975) 46 Cal.App.3d 675, 683–684 [120 Cal.Rptr. 291] [duty to investigate], disapproved on other grounds in *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 883, fn. 9 [254 Cal.Rptr. 336, 765 P.2d 498]; *Norton v. Hines* (1975) 49 Cal.App.3d 917, 923 [123 Cal.Rptr. 237] [same]; e.g., *Kraemer v. Grant County* (7th Cir. 1990) 892 F.2d 686, 689–690 [hiring private investigator satisfied counsel's duty to investigate claim before filing complaint].) In our view, moreover, the prelitigation investigation of a potential claim is no less incidental or related to possible litigation than prelitigation demand letters and threats to sue, which are entitled to protection. In fact, such letters and threats are themselves likely to be the result of a prelitigation investigation.

Given the close functional relationship between the preliminary investigation of a potential claim and the subsequent assertion of that claim, we consider it obvious that restricting, enjoining, or penalizing prelitigation investigation could substantially interfere with and thus burden the effective exercise of one's right to petition. Indeed, we can think of few better ways to burden that right than to make it difficult and perhaps legally risky for people to investigate and find evidence to support potential claims. For this reason, we consider it as proper and appropriate to protect prelitigation investigation as it is to protect prelitigation letters that demand settlement or threaten legal action discovery, and postlitigation settlement talks.

We find support for our analysis in a number of cases. In *Coastal States Mktg., Inc. v. Hunt, supra,* 694 F.2d 1358, the court generally opined that "it would be absurd to hold that [*Noerr-Pennington*] does not protect those acts reasonably and normally attendant upon effective litigation." (*Id.* at p. 1367.) As noted, prelitigation investigation is a typical feature of effective litigation.

In *Poole v. County of Otero, supra,* 271 F.3d 955, abrogated on other grounds in *Hartman v. Moore, supra,* 547 U.S. 250, 256, Poole was injured in a motorcycle accident that occurred while the police were chasing him. After investigating the scene and talking to witnesses, the police cited him for

careless driving. Later, his attorney wrote a letter asking authorities to preserve evidence of the accident. At that time, Poole had not filed a claim, and the letter did not state that he was considering doing so. In response, officials withdrew the citation and formally charged Poole with six counts of reckless driving and evading arrest. Poole filed a 1983 action, alleging, among other things, wrongful retaliation against him for requesting the preservation of evidence. (*Poole*, at pp. 958, 960.) On these facts, the court concluded that counsel's letter was protected activity even in the absence of pending litigation because "[t]he right of access to courts applies to activities leading up to the formal filing of a complaint." (*Id.* at p. 961.) Thus, in protecting the letter, which sought only to preserve evidence so that it could be analyzed and evaluated in connection with possible litigation, *Poole* strongly implies that such an analysis and related investigation would also enjoy such constitutional protection.

In *King v. Township of East Lampeter* (E.D.Pa. 1998) 17 F.Supp.2d 394, the defendant took photographs of the plaintiffs' property which he later used to support his testimony against the plaintiffs about the condition of the property. Later, the plaintiffs sued the defendant for conspiracy, claiming that the defendant had taken the pictures and later testified for malevolent reasons. (*Id.* at pp. 400–402, 412.) In finding that the defendant's conduct was constitutionally protected, the court first explained that the defendant's motivation was irrelevant because his testimony related to litigation designed to ensure compliance with local zoning ordinances, and, there was no evidence that the enforcement effort was a sham intended only to harass the plaintiffs. The court specifically found that taking the photographs was also protected because it related directly to and supported the defendant's testimony, and there was no claim or evidence that taking them had wrongfully invaded the plaintiffs' privacy. (*Id.* at pp. 412–413.) Thus, the photographic investigation of the plaintiffs' property was within the "breathing space" of the right to petition because it was incidental and related to the defendant's future, nonsham litigation. (See also *American Steel Erectors, Inc. v. Local Union No. 7, Intern. Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers* (D.Mass., Feb. 6, 2006, No. Civ. A. 04-12536RGS) 2006 WL 300422, p. *4, fn. 6 [unreported] [videotaping nonunion worksites to gather evidence for possible complaints to state and federal authorities "would seem to be activity protected by the First Amendment"].)[10]

---

[10] Although we may not rely on unpublished California cases, the California Rules of Court do not prohibit citation to unpublished federal cases, which may properly be cited as persuasive, although not binding, authority. (Cal. Rules of Court, rule 8.1115; *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18 [72 Cal.Rptr.3d 112, 175 P.3d 1170]; *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 548, fn. 9 [87 Cal.Rptr.3d 99]; e.g., *Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1352, fn. 6 [42 Cal.Rptr.3d 283] [citing unreported federal cases as persuasive authority].)

■ In short, we have no difficulty concluding that prelitigation investigation to support a potential claim is sufficiently related to the right to petition as to fall within the protected "breathing space" of that right. However, whether it does in a particular case further depends on whether the potential claim being investigated was legitimate or a sham.[11]

Turning to the facts in this case, we reiterate that on appeal, we independently review the anti-SLAPP motion, and in doing so, we accept as true the evidence favorable to Tichinin, determine only whether he has made a prima facie showing of facts necessary to establish his claim at trial, and evaluate the City's evidence only to determine if it defeats plaintiff's showing *as a matter of law.* (*Soukup v. Law Offices of Herbert Hafif, supra,* 39 Cal.4th at p. 269, fn. 3; *Paulus, supra,* 139 Cal.App.4th at p. 673.)

Here, Tichinin presented evidence that his client, Councilmember Chang, informed him of her belief that Tewes and Leichter were engaged in an inappropriate relationship. In fact, she retained Tichinin because Leichter had threatened to sue her and the City based, in part, on Chang's statements about the alleged relationship. Later, Tichinin suspected that the existence of such a relationship might explain why Leichter appeared to have changed her position concerning the merits of his client Vierra's appeal of the Department's rejection of his residential project. Under the circumstances, and with Vierra's authorization, Tichinin hired an investigator to conduct surveillance of Tewes at the conference and gather evidence concerning the alleged affair. According to Tichinin, he did so because if his investigation uncovered such a relationship, then he intended to present the evidence to the Council and seek Leichter's removal from further involvement in the proceedings related to the Vierra project due to her conflict of interest; and if the Council declined to remove her, he intended to sue the City for unlawful retaliation, claiming that Tewes had been able to influence Leichter to oppose the Vierra project as retaliation against Tichinin for representing Chang and opposing the Paulus car dealership, which Tewes had favored.

Under the circumstances, we find that Tichinin made a prima facie showing that his prelitigation investigation was protected by the right to petition: The investigation was incidental and reasonably related to a potential claim that Leichter had a conflict of interest, a claim that he would have made to the Council or incorporated into a lawsuit against the City had that investigation produced evidence of an inappropriate romantic relationship to support it. The question, therefore, becomes whether *other* evidence presented in the anti-SLAPP motion would preclude such a finding as a matter of law, that is, whether the evidence conclusively establishes that the alleged romantic

---

[11] The City concedes that the *Noerr-Pennington* doctrine protects "legitimate, non-sham, pre-filing investigation activities, which are not criminal."

relationship and claim of conflict of interest that Tichinin purported to investigate were just a sham.

 The sham exception has both an objective and subjective element: a petition or litigation must be objectively baseless, in that one could not reasonably expect it to succeed; and the person making the petition or pursuing the litigation must be motivated by an improper purpose. (*BE&K Constr. Co. v. NLRB, supra,* 536 U.S. at p. 526; see fn. 8, *ante.*)

 Concerning the first element, we note that " '[c]onflicts [of interest] come in all shapes and sizes,' " and can arise from inappropriate romantic relationships. (*Manfredi & Levine v. Superior Court* (1998) 66 Cal.App.4th 1128, 1134 [78 Cal.Rptr.2d 494], quoting *Aceves v. Superior Court* (1996) 51 Cal.App.4th 584, 590 [59 Cal.Rptr.2d 280].) Indeed, at his deposition, Dennis Kennedy, a Council member and Mayor of the City, testified that in his view, an affair between Tewes and Leichter would have raised the issue of a potential conflict of interest.

The evidence presented below does not conclusively show that at the time Tichinin hired the private investigator, a claim of conflict of interest was objectively baseless, in that no reasonable person could believe that Tewes and Leichter were involved in an inappropriate romantic relationship. As noted, there had been rumors of a relationship, Chang had retained Tichinin to defend against a possible lawsuit based on her statements about the relationship, and she believed that such a relationship existed. Indeed, although Chang later distanced herself from the surveillance activity, it initially would have been reasonable for Tichinin to believe that he had a duty to Chang to investigate the truth of the statements she might be held liable for. Moreover, only by investigating whether such a relationship existed could Tichinin determine the potential merits of his claim that Leichter had a conflict of interest. That the results of the investigation undermined the claim does not retrospectively render it objectively baseless.

Similarly, the evidence presented below does not establish as a matter of law that Tichinin pursued the investigation for an improper reason unrelated to a legitimate petitioning purpose. In other words, the evidence does not conclusively rebut Tichinin's explanation for hiring the investigator or establish that he pursued the investigation simply to harass or intimidate Tewes or Leichter.

Having found that Tichinin has made a prima facie showing, we now address the trial court's reasons for concluding that his conduct was not protected by the right of petition.

The court found that the investigation was not relevant to any petitioning activity. In particular, the court found that it was mere speculation to think

that the alleged inappropriate relationship affected the Department's initial decision to reject Vierra's project or the Council's subsequent decision to file a declaratory relief action. The court also found it speculation for Tichinin to think that Leichter's removal and the appointment of outside counsel would change those decisions. Last, the court noted that at the meeting on February 3, 2004, Vierra told Tichinin that he did not want to file a 1983 action. That the connection between the alleged relationship and the formal decisions by the Department and Council may, in retrospect, appear speculative is irrelevant in the instant context.

To defeat the anti-SLAPP motion, Tichinin did not have to show that the alleged relationship and potential conflict of interest caused or affected the formal decisions or would or could ultimately have led to a reversal of those decisions without the need for a declaratory relief action. Tichinin's burden was to show that the investigation was sufficiently related to a potentially valid, nonsham effort to petition the government to constitute protected conduct. Because his investigation conceivably could have revealed evidence of an inappropriate relationship that would then have formed the factual basis for a claim to the Council, the investigation was necessarily incidental to petitioning conduct. This is so even though, as a result of the investigation, Tichinin elected not to file a formal petition. Moreover, that Vierra said he did not want to file a lawsuit against the City does not establish that either the potential claim of conflict of interest or subsequent lawsuit was a sham.

Furthermore, even if, as the court's findings imply, the connection between the alleged relationship and the rejection of the Vierra project was so speculative as to render Tichinin's claims objectively baseless, that would not exclude the investigation from constitutional protection because, as noted, there is no evidence that Tichinin pursued the investigation for an improper purpose unrelated to petitioning conduct.

In support of the trial court's analysis, the City cites *People ex rel. 20th Century Ins. Co. v. Building Permit Consultants, Inc.* (2000) 86 Cal.App.4th 280 [103 Cal.Rptr.2d 71] (*20th Century*) for the proposition that "the anti-SLAPP statute does not protect claims that could 'eventually' be made in connection with an official proceeding . . . ." However, the City's point is irrelevant, and *20th Century* is inapposite.

In that case, the issue was whether *the defendant's* conduct qualified for protection under the anti-SLAPP statute. (*20th Century, supra,* 86 Cal.App.4th at pp. 283–285.) There, the defendant was sued for preparing false insurance damage estimates for victims of the Northridge earthquake, estimates that in some cases made their way as evidence into judicial proceedings. The court concluded that because the estimates were not prepared "before," or "in

connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)), that conduct was not "in furtherance of [the defendant's] right of petition or free speech" (§ 425.16, subd. (b)(1)) and, therefore, did not qualify for protection under the anti-SLAPP statute. (*20th Century, supra*, 86 Cal.App.4th at p. 285.) The issue here is not whether Tichinin's conduct qualifies for protection under the anti-SLAPP statute but whether his conduct can be considered protected activity for purposes of his 1983 claim.

### ii. *The Right of Free Speech*

█ Although the right to petition and the right of free speech are separate and not identical rights, they are nevertheless "inseparable." (*McDonald v. Smith* (1985) 472 U.S. 479, 485 [86 L.Ed.2d 384, 105 S.Ct. 2787]; *Thomas v. Collins* (1945) 323 U.S. 516, 530 [89 L.Ed. 430, 65 S.Ct. 315].) Indeed, they necessarily overlap: the right to petition the government for relief presupposes the right to freely express and communicate one's thoughts, ideas, and opinions related to that relief; and the right of free speech necessarily includes the right to express one's grievances to the government and seek redress. Thus, where one separately claims that the same conduct is protected by both rights, the two claims can be considered "essentially the same," and subject to similar constitutional analyses. (*Wayte v. United States* (1985) 470 U.S. 598, 610, fn. 11 [84 L.Ed.2d 547, 105 S.Ct. 1524].)

█ Such is the case here. Although Tichinin asserted separate causes of action based on violations of his right to petition and right of free speech, those claims are identical insofar as both allege that hiring an investigator was protected conduct. Moreover, we conclude that hiring an investigator can also be considered protected under the right of free speech.

Case law supports our view and conclusion. In *Schneider v. State* (1939) 308 U.S. 147 [84 L.Ed. 155, 60 S.Ct. 146], the high court indicated that First Amendment protection extends to conduct that intrinsically facilitates exercise of free speech. There, the court held that the First Amendment protected reasonable access to the streets, where people could speak, write, print or circulate information or opinion, because access intrinsically facilitated the exercise of First Amendment rights. (308 U.S. at p. 160.)

Similarly, the high court has recognized that the ability to gather information is entitled to constitutional protection because it too facilitates the exercise of free speech. For example, in *Richmond Newspapers, Inc. v. Virginia* (1980) 448 U.S. 555 [65 L.Ed.2d 973, 100 S.Ct. 2814], the court

held that "the right to attend criminal trials is implicit in the guarantees of the First Amendment" because "without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.' " (*Id.* at p. 580, fn. omitted, quoting *Branzburg v. Hayes* (1972) 408 U.S. 665, 681 [33 L.Ed.2d 626, 92 S.Ct. 2646].) The court said that this right encompassed both a " 'right of access' " and a " 'right to gather information,' " and explained that the media's right is no less important than that of the general public. (*Richmond Newspapers*, at pp. 576–577 & fn. 12.)[12] Similarly, the court in *In re Express-News Corp.* (5th Cir. 1982) 695 F.2d 807 stated, "The first amendment's broad shield for freedom of speech and of the press is not limited to the right to talk and to print. The value of these rights would be circumscribed were those who wish to disseminate information denied access to it, for freedom to speak is of little value if there is nothing to say." (*Id.* at p. 808; cf. *Lakewood v. Plain Dealer Publishing Co.* (1988) 486 U.S. 750, 768 [100 L.Ed.2d 771, 108 S.Ct. 2138] [1st Amend. protects use of news racks, which facilitate exercise of free speech]; *Mine Workers v. Illinois Bar Assn., supra*, 389 U.S. at p. 223 [hiring a lawyer protected by right of free speech].)

In *Smith v. City of Cumming* (11th Cir. 2000) 212 F.3d 1332, the court concluded that the right of free speech "protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest." (*Id.* at p. 1333, citing *Blackston v. Alabama* (11th Cir. 1994) 30 F.3d 117, 120 [filming public meetings], *Fordyce v. City of Seattle* (9th Cir. 1995) 55 F.3d 436, 439 [filming "matters of public interest"], *Iacobucci v. Boulter* (D.Mass, Mar. 26, 1997, No. CIV. A. 94-10531-PBS) 1997 WL 258494 [unreported] [videotaping public meetings], *U.S. v. Hastings* (11th Cir. 1983) 695 F.2d 1278, 1281 [right to public information], *Lambert v. Polk County* (S.D. Iowa 1989) 723 F.Supp. 128, 133 [right to make and display film of events], *Thompson v. City of Clio* (M.D.Ala. 1991) 765 F.Supp. 1066, 1070–1071 [record public meetings].) Accordingly, the *Smith* court held that the plaintiffs had stated a First Amendment claim based on allegations that public officials had wrongfully

---

[12] In his concurring opinion, Justice Brennan explained that subject to reasonable limitations, the right of access to information may be implied by the First Amendment guarantees which, although customarily interposed "to protect communication between speaker and listener," play "a *structural* role . . . in securing and fostering our republican system of self-government" and ensuring that debate on public issues should be uninhibited, robust, wide open, and *informed*. (*Richmond Newspapers, Inc. v. Virginia, supra*, 448 U.S. at pp. 586–587 (conc. opn. of Brennan, J.), original italics.) "The structural model links the First Amendment to that process of communication necessary for a democracy to survive, and thus entails solicitude not only for communication itself, *but also for the indispensable conditions of meaningful communication*." (*Id.* at pp. 587–588 (conc. opn. of Brennan, J.), fn. omitted, italics added.)

prevented them from videotaping police activity. (*Smith v. City of Cumming, supra,* 212 F.3d at p. 1332.)

In *Robinson v. Fetterman* (E.D.Pa. 2005) 378 F.Supp.2d 534, the plaintiff suspected that the state troopers were inspecting trucks in an unsafe manner. After expressing this view to the state legislature, he started videotaping the inspections from a distance. He was arrested and convicted of harassment, but his conviction was later reversed and the charges dismissed. Thereafter, he filed a section 1983 action alleging, among other things, a violation of his right to free speech. (378 F.Supp.2d at pp. 538–539.)

In concluding that the plaintiff had stated a claim, the court explained, "The activities of the police, like those of other public officials, are subject to public scrutiny. Indeed, 'the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.' [Citation.]" (*Robinson v. Fetterman, supra,* 378 F.Supp.2d at p. 541.) Moreover, "[the plaintiff's] right to free speech encompasses the right to receive information and ideas. [Citation.] He also has a First Amendment right to express his concern about the safety of the truck inspections to the appropriate government agency or officials, whether his expression takes the form of speech or conduct. [Citations.] Videotaping is a legitimate means of gathering information for public dissemination and can often provide cogent evidence, as it did in this case. In sum, there can be no doubt that the free speech clause of the Constitution protected [the plaintiff] as he videotaped the defendants . . . . [Citations.] Moreover, to the extent that the troopers were restraining [the plaintiff] from making any future videotapes and from publicizing or publishing what he had filmed, the defendants' conduct clearly amounted to an unlawful prior restraint upon his protected speech. [Citations.]" (*Id.* at p. 541.)

*Pomykacz v. Borough of West Wildwood* (D.N.J. 2006) 438 F.Supp.2d 504 is particularly pertinent to our discussion. There, the plaintiff, a self-described citizen activist, had closely followed the activities of the police force and mayor of her town for years. In 2002, she and others in town suspected that the mayor and a police officer were having a romantic relationship. The possible relationship raised the plaintiff's concerns about nepotism, conflict of interest, and preferential treatment for the officer. The plaintiff and others were also concerned that the officer, among others, was being paid overtime for volunteer work renovating the police station that was performed during patrol shifts. Given her suspicions and concerns, the plaintiff started watching the officer's and the mayor's activities and gathering photographic evidence. One night, the plaintiff saw the officer working on renovations while on duty. Later that night, the plaintiff saw the officer and mayor inside police

headquarters and took photographs of them. Upon seeing her, the mayor came out and yelled at her. After the incident, the officer and mayor consulted with the district attorney, who issued a complaint charging the plaintiff with stalking. A judge signed a warrant for her arrest and issued a restraining order. She was later arrested. The charges were lowered to harassment, and after a court trial she was convicted of harassing the officer, but not the mayor, and fined. However, the conviction was reversed on appeal. Thereafter, the plaintiff filed a 1983 action against the city, the officer, and the mayor, alleging that her arrest for stalking was an attempt to silence her in retaliation for her monitoring activities and concerns about improper conduct by public officials. (438 F.Supp.2d at pp. 506–508, 512.)

In denying a defense motion for summary judgment, the court explained the First Amendment clearly protected the plaintiff's right to express her concerns about the official conduct of police officers and the mayor. (*Pomykacz v. Borough of West Wildwood, supra,* 438 F.Supp.2d at pp. 512–513, citing *Mills v. Alabama* (1966) 384 U.S. 214, 218 [16 L.Ed.2d 484, 86 S.Ct. 1434] ["a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs"] and *Roth v. United States* (1957) 354 U.S. 476, 484 [1 L.Ed.2d 1498, 77 S.Ct. 1304] ["The protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."].) The court further concluded the First Amendment protected the plaintiff's evidence gathering activities—i.e., monitoring and photographing the officer and mayor—because they were a part of her political activism and the expression of her concerns about public officials. (*Pomykacz v. Borough of West Wildwood, supra,* 438 F.Supp.2d at p. 513; see *Gilles v. Davis* (3d Cir. 2005) 427 F.3d 197, 212, fn. 14 [videotaping or photographing the police in the performance of their duties on public property may be a protected activity]; cf. also *Nicholson v. McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 517 [223 Cal.Rptr. 58] [lawful news gathering entitled to 1st Amend. protection]; *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 [1 Cal.Rptr.3d 536] [same].)

■ These authorities illustrate that the right of free speech protects not only the actual expression of one's views, thoughts, opinions, and information concerning improper or unlawful conduct by public officials but also nonexpressive conduct that intrinsically facilitates one's ability to exercise the right of free speech, including lawful efforts to gather evidence and information about public officials concerning allegedly improper or unlawful conduct.

Here, Tichinin presented evidence that his investigator conducted surveillance of Tewes, who was attending a conference in his official capacity as city manager, for the purpose of gathering evidence and information concerning whether Tewes and Leichter were having a romantic affair, which, if true,

would be a matter of public concern that Tichinin intended to communicate to members of the Council and use to seek relief. This evidence constitutes a prima facie showing that the investigation was also protected by his right of free speech.

The City argues that Tichinin's conduct was not protected because his investigator was not collecting information on behalf of the media for the purpose of publishing the news. However, the City cites no authority for the proposition that the First Amendment protects only the media's right to gather evidence and information.

The City argues that the First Amendment does not protect the surveillance in this case because (1) it was not conducted on public property or from a place where Tichinin's investigator had permission to be for the purpose of secretly watching and videotaping Tewes, and (2) the surveillance was intended to gather personal and private information.

Again, the City cites no authority for the proposition that the First Amendment protects efforts to gather information only from public places. Nor does the City cite authority for the proposition that First Amendment protection here was contingent on Tichinin obtaining permission from the hotel to watch and videotape Tewes. Although the cases noted above may have involved such circumstances, they do not suggest that only newsgathering from a public place or a private place with the express permission to conduct surveillance from the owner of the premises is protected. Moreover, the record does not conclusively establish that Tichinin's investigator conducted surveillance from a place where he was not entitled to be, whether inside or outside the hotel. Rather, it appears that the investigator had reserved his own room at the hotel and watched Tewes from common areas inside the hotel and public places outside it. Finally, that the investigator was looking for evidence of a private and personal nature—i.e., an inappropriate romantic relationship—does not suggest that the activity fell outside First Amendment protection because the nature of the alleged inappropriate relationship reasonably implicated matters of public concern related to the performance of official duties. As noted, Dennis Kennedy, a Council member and Mayor of the City, opined that an affair between Tewes and Leichter would have raised the issue of a potential conflict of interest.

The City alternatively claims that even if the investigation were protected activity, the value of the investigation was outweighed "by the corresponding import of Mr. Tewes' intruded-upon right to privacy." Citing *Wolfson v. Lewis* (E.D.Pa. 1996) 924 F.Supp. 1413 and *Galella v. Onassis* (2d Cir. 1972) 487 F.2d 986, the City asserts that while the First Amendment generally may protect *lawful* investigative activity, it does not protect criminal or tortious

conduct, such as trespass, theft, assault, harassment, or wrongful invasion of privacy. Thus, the City argues, in essence, that Tichinin failed to make a prima facie showing that the investigation was protected because the surveillance of Tewes was an unlawful or at least a tortious invasion of Tewes's privacy.

Whether the investigator's conduct was criminal or tortious involves factual determinations based on competent and admissible evidence, and such a determination was far beyond the purpose and scope of the proceedings on the anti-SLAPP motion. In any event, there is no evidence, competent or otherwise, to support a finding that Tichinin's investigator committed criminal trespass, assault, or theft. Nor does the record conclusively show that the investigator's conduct was criminal or even tortious.[13] Although the investigator may have ordered hot chocolate sent to Tewes's room, called the room asking for someone else, tried to videotape Tewes in a hotel hallway, and observed Tewes outside the hotel from a parking lot; and although Tewes may have been offended and disturbed by this conduct; the evidence does not establish *as a matter of law* that the investigator's conduct was criminal or even tortious. The cases cited by the City do not suggest otherwise.

In *Wolfson v. Lewis, supra*, 924 F.Supp. 1413, the court found, based on competent evidence, that television reporters had engaged in an intentional, lengthy, and persistent course of conduct that was unrelated to a legitimate newsgathering purpose and involved (1) highly persistent and intrusive surveillance of the target and all of his family members from vantage points around their private residence with sophisticated sound equipment, special microphones, and video cameras with zoom lenses designed to record private events and conversations from a distance; (2) hounding and confronting the target in an intimidating manner; and (3) engaging in frightening and harassing conduct toward the target and his family. Because the evidence could support a finding of invasion of privacy, the court affirmed an order enjoining it. (*Id.* at pp. 1422–1435.)

*Galella v. Onassis, supra*, 487 F.2d 986 involved the conduct of a freelance "paparazzo" who specialized in taking and selling pictures of celebrities, including Jacqueline Onassis and her children. (*Id.* at pp. 991–992.) Among other things, the court held the photographer liable for harassment, intentional infliction of emotional distress, assault and battery, commercial exploitation of the Mrs. Onassis's personality, and invasion of privacy. Based on competent evidence, the court found that on occasion Galella had intentionally touched Mrs. Onassis and her daughter, caused fear of physical contact in his

---

[13] We note that although the City prepared a complaint against the investigator, it was never filed. Nor does it appear that Tewes initiated any civil action based on an alleged invasion of privacy.

frenzied attempts to get their pictures, followed Mrs. Onassis and her children too closely in an automobile, and endangered the safety of the children while they were swimming, water-skiing and horseback riding. (*Id.* at p. 994.)

The evidence here is not remotely comparable to the extreme, excessive, and unreasonable conduct in *Wolfson* and *Galella*. Moreover, Tichinin's evidence would support a finding that the purpose of his investigation was related to an issue of public concern—i.e., a possible conflict of interest between city officials—the purpose of the intrusive conduct in *Wolfson* and *Galella* was not similarly related to an issue of public concern.

Last, we address the trial court's reasons for finding that the investigation was not protected by the right of free speech. The trial court acknowledged that the First Amendment protects not just verbal communications but also nonverbal expressive acts that are imbued with the elements of communication. However, citing *Tenafly Eruv Association, Inc. v. Borough of Tenafly* (3d Cir. 2002) 309 F.3d 144, the court reasoned that because the surveillance was intended to be entirely surreptitious and the evidence of an adulterous affair, if discovered, was to be reported privately to the Council, Tichinin's conduct was not sufficiently communicative to enjoy First Amendment protection as free speech.[14] We find this analysis to be flawed.

Although the court correctly noted that the right of free speech protects both actual verbal communication and expressive, nonverbal conduct (*Virginia v. Black* (2003) 538 U.S. 343, 358 [155 L.Ed.2d 535, 123 S.Ct. 1536] ["The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech."]; see *Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503, 505–506 [21 L.Ed.2d 731, 89 S.Ct. 733]; *Spence v. Washington* (1974) 418 U.S. 405, 410–411 [41 L.Ed.2d 842, 94 S.Ct. 2727]), it failed to recognize that constitutional protection can also extend to nonexpressive conduct that intrinsically facilitates the exercise of free speech, such as using public streets, attending public hearings and trials, and lawfully gathering information about public officials and matters of public concern.

■ Second, the court's analysis erroneously implies that the First Amendment does not protect the surreptitious gathering of information, private communications between individuals, or speech to a limited audience.

---

[14] The court found, "In this case, the evidence presented by Plaintiffs shows that they intended the videotaped surveillance of the hallway outside the City Manager's hotel room to be done secretly. If the private investigator succeeded in gathering evidence that the suspected relationship existed, Plaintiffs planned to report the fact *privately* to the City Council. In this context, the surveillance is not sufficiently imbued with elements of communication to be protected by the free speech clause of the First Amendment. This is fatal to Plaintiff's second cause of action."

However, "except for certain narrow categories deemed unworthy of full First Amendment protection—such as obscenity, 'fighting words' and libel—all speech is protected by the First Amendment. [Citation.]" (*Eichenlaub v. Township of Indiana* (3d Cir. 2004) 385 F.3d 274, 282–283.) Moreover, in general, that protection applies not just to communications broadcast to the public at large but also to private speech between individuals. (E.g., *Rankin v. McPherson* (1987) 483 U.S. 378 [97 L.Ed.2d 315, 107 S.Ct. 2891] [private comment by one employee to another entitled to protection]; *Givhan v. Western Line Consol. School Dist.* (1979) 439 U.S. 410 [58 L.Ed.2d 619, 99 S.Ct. 693] [employee's private communications to employer protected]; *O'Connor v. Steeves* (1st Cir. 1993) 994 F.2d 905 [communications in private meeting with members of city governing board]; cf. *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 [54 Cal.Rptr.2d 830] [anti-SLAPP statute protects private conversations]; *Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62] [same].)

Finally, the trial court's reliance on *Tenafly Eruv Association, Inc. v. Borough of Tenafly, supra,* 309 F.3d 144 is misplaced. That case did not discuss whether nonexpressive conduct such as gathering evidence was entitled to First Amendment protection. The issue there was whether attaching *lechis*—thin black strips of plastic—to utility poles to set the boundary of an *eruv*—the area within which an Orthodox Jew may push or carry something on the Sabbath—was itself protected expressive conduct. (309 F.3d at p. 158.) The court opined that since the *lechis* served a purpose akin to that of a fence surrounding a yard or a wall surrounding a building, they were not sufficiently imbued with the elements of communication to qualify as expressive conduct or symbolic speech. (*Id.* at pp. 161–165.) *Tenafly* does not, however, suggest that the First Amendment protects only actual or symbolic speech; nor does it suggest the First Amendment does not protect nonexpressive conduct intrinsic to the exercise of First Amendment rights.

b. *Sufficient Injury from the City's Action*

In addition to showing that he was engaged in constitutionally protected conduct, Tichinin had to make a prima facie showing that the City's action against him caused injuries that would chill a person of ordinary firmness from further engaging in the same protected conduct. In his complaint, Tichinin alleged that the City's action induced fear of criminal prosecution and State Bar discipline, shame, outrage, and emotional distress and caused a loss of professional reputation, income, and goodwill. In his declaration in opposition to the anti-SLAPP motion, Tichinin reiterates and provides a factual basis for these allegations. Moreover, the record establishes that the investigative subcommittee report threatened public condemnation, removal

from a City committee, and referrals to the district attorney and State Bar, and the Council's resolution condemned Tichinin for his conduct and constituted a public reprimand.

■ The United States Supreme Court has held that, in the context of a 1983 action, "compensatory damages may include . . . such injuries as 'impairment of reputation . . . , personal humiliation, and mental anguish and suffering.' " (*Memphis Community School Dist. v. Stachura* (1986) 477 U.S. 299, 307 [91 L.Ed.2d 249, 106 S.Ct. 2537], quoting *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 350; cf. *Chatman v. Slagle* (6th Cir. 1997) 107 F.3d 380, 384–385 [listing numerous cases that have found emotional distress to be a compensable injury under 42 U.S.C. § 1983, including damages for " 'intimidation, marital problems, weight loss, loss of sleep, shock, or humiliation' "]; *White v. Lee* (9th Cir. 2000) 227 F.3d 1214, 1228 [informal measures, such as " 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation,' " can show constitutional violation]; e.g., *Garcia v. City of Trenton* (8th Cir. 2003) 348 F.3d 726, 729 [retaliatory issuance of numerous parking citations sufficient to show injury]; *Bart v. Telford* (7th Cir. 1982) 677 F.2d 622, 625 [campaign of petty harassment and ridicule]; *Worrell v. Henry* (10th Cir. 2000) 219 F.3d 1197, 1213 [disparaging comments about professional trustworthiness and impact on career]; see *Bloch v. Ribar, supra,* 156 F.3d at p. 681 [public humiliation]; *Barrett v. Harrington* (6th Cir. 1997) 130 F.3d 246, 263 [false accusation of stalking, humiliation, and denigration]; *Bernheim v. Litt* (2d Cir. 1996) 79 F.3d 318, 325–326 [harassment including criticism].)

We find that the evidence of Tichinin's alleged injuries, if believed, is sufficient to support a finding that the retaliatory action against him would deter a person of ordinary firmness from exercising his or her First Amendment rights.

■ The City argues that Tichinin did not suffer any injury—i.e., the City's action did not chill Tichinin's exercise of his rights—because he continued to litigate against the City. However, that Tichinin persevered despite the City's action is not determinative. To reiterate, in the context of a claim of retaliation, the question is not whether the plaintiff was actually deterred but whether the defendant's actions would have deterred a person of ordinary firmness. (*Garcia v. City of Trenton, supra,* 348 F.3d at p. 729.)

### c. *Causal Connection*

Tichinin also had to make a prima facie showing that the Council took adverse action against him, at least in part, because he hired the private investigator. The City concedes, and the undisputed evidence shows, that

hiring the investigator was the primary reason that the Council took action against Tichinin. Thus, Tichinin has satisfied this aspect of his burden.[15]

Citing the declaration of Sellars and the trial court's order, the City asserts that all adverse actions were taken " 'in furtherance of [its] legitimate interest in preserving the personal privacy of its officials.' " Insofar as the City is claiming that Tichinin cannot establish a sufficient causal connection, we disagree. While protecting Tewes's privacy in the future may have been the City's prospective goal, the undisputed evidence establishes that the primary reason for taking action against Tichinin was the hiring of an investigator.

The City also claims that Tichinin's concession that the City's action qualifies for protection under the anti-SLAPP statute precludes him from making a prima facie showing because, as a matter of law, the City is immune from liability for its protected actions under the *Noerr-Pennington* doctrine and California's statutory "litigation" privilege (Civ. Code, § 47).

The City seems to imply that a determination that its actions were protected conduct for purposes of an anti-SLAPP motion renders the second step of the anti-SLAPP analysis irrelevant. The City further implies that because its actions qualified for protection, it is immune from liability even if the purpose of its actions was to retaliate against Tichinin for exercising his First Amendment rights. We are not persuaded.

In support of its position, the City, purporting to quote *Equilon, supra,* 29 Cal.4th 53, asserts that " 'the critical consideration is whether the cause of action is based on the defendants' protected free speech or petitioning activity . . . .' " However, that language, which is from *Navellier v. Sletten, supra,* 29 Cal.4th at page 89, and not from *Equilon,* does not suggest that the second step of the anti-SLAPP analysis becomes irrelevant once the defendant satisfies the first step. Rather, the burden merely shifts to the plaintiff to demonstrate a prima facie case for relief. Only where the defendant satisfies his or her burden, *and* the plaintiff fails to make a sufficient showing of probable success, may the court grant anti-SLAPP relief. (*Equilon, supra,* 29 Cal.4th at p. 67.)

---

[15] We note that in cases where an employee claims retaliatory adverse action by an employer based on protected conduct, the employer may negate factual causation and thereby avoid liability by proving that it would have taken the adverse action for a reason unrelated to the protected conduct and in the absence of that conduct. (*Mt. Healthy City Board of Ed. v. Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 97 S.Ct. 568].)

The City does not cite *Mt. Healthy* or argue that it would have taken the adverse action against Tichinin solely and exclusively because he initially denied having hired the private investigator. Moreover, even if the City had raised such a claim, the record does not conclusively establish that fact or even reasonably support such a finding.

 Moreover, the fact that the City's actions qualified for protection under the anti-SLAPP statute does not automatically immunize it from liability if those actions constituted wrongful retaliation. The United States Supreme Court explained, "[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under [section] 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy. [Citations.]" (*Pembaur v. Cincinnati* (1986) 475 U.S. 469, 480 [89 L.Ed.2d 452, 106 S.Ct. 1292]; e.g., *Owen v. City of Independence* (1980) 445 U.S. 622 [63 L.Ed.2d 673, 100 S.Ct. 1398] [city council passed resolution firing plaintiff without a pretermination hearing]; *Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247 [69 L.Ed.2d 616, 101 S.Ct. 2748] [city council canceled license permitting concert because of dispute over content of performance].)

 Moreover, as Tichinin correctly notes, actions that are otherwise proper and lawful may nevertheless be actionable if they are taken in retaliation against a person for exercising his or her constitutional rights. (*Mt. Healthy City Board of Ed. v. Doyle, supra*, 429 U.S. at pp. 283–284; *Bloch v. Ribar, supra*, 156 F.3d at pp. 681–682; *DeLoach v. Bevers* (10th Cir. 1990) 922 F.2d 618, 620; *Matzker v. Herr* (7th Cir. 1984) 748 F.2d 1142, 1150, overruled on other grounds in *Salazar v. City of Chicago* (7th Cir. 1991) 940 F.2d 233, 240.)

The City's reliance on *Manistee Town Center v. City of Glendale* (9th Cir. 2000) 227 F.3d 1090 is also misplaced. There, city officials conducted a lobbying and public relations campaign opposing a shopping center owner's effort to lease the center to a county agency. After the lease negotiations collapsed, the owners filed a 1983 action against the city. (227 F.3d at pp. 1091–1092.) The court held that the city's lobbying and public relations effort to influence the county constituted nonsham, petitioning activity immune from liability under the *Noerr-Pennington* doctrine. (*Id.* at pp. 1092–1095.)

Here, the City's resolution, which underlies Tichinin's claim, does not constitute lobbying an executive, legislative, or judicial body or engaging in a public relations campaign to influence a governmental decision—i.e., petitioning conduct. Rather, the resolution is a governmental decision.[16]

---

[16] We need not discuss the City's assertion that the litigation privilege (Civ. Code, § 47) absolutely immunized its resolution from liability because the City cites no authority and provides no reasoned argument to support it or the notion that a state statutory privilege

## C. *Permissible Adverse Action*

Citing *Younger v. Harris* (1970) 401 U.S. 37 [27 L.Ed.2d 669, 91 S.Ct. 746], *Cameron v. Johnson* (1968) 390 U.S. 611 [20 L.Ed.2d 182, 88 S.Ct. 1335], and *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency* (1996) 77 F.3d 26 (*Greenwich*), the City claims that even if its action were based, in part, on Tichinin's exercise of First Amendment rights and even if it had some incidental tendency to chill the future exercise of those rights, its actions were nevertheless justified because they were taken in furtherance of a legitimate interest in protecting the future privacy of public officials. Accordingly, the City argues that Tichinin cannot make a prima facie showing of success on either of his causes of action.[17] We disagree.

In *Cameron* and *Younger*, the court declined to enjoin criminal prosecutions under state laws, even though the good faith enforcement of those laws could have had an incidental chilling effect on the exercise of First Amendment rights. In *Cameron*, the statute proscribed picketing that disrupts access to and from public buildings and on the sidewalks and streets adjacent to them. (*Cameron v. Johnson, supra*, 390 U.S. at pp. 612–613.) The court explained that " 'picketing and parading [are] subject to regulation even though intertwined with expression and association,' [citation] and [the] statute does not prohibit picketing so intertwined unless engaged in a manner which obstructs or unreasonably interferes with ingress or egress to or from the courthouse. Prohibition of conduct which has this effect does not abridge constitutional liberty 'since such activity bears no necessary relationship to the freedom to . . . distribute information or opinion.' [Citation.]" (*Id.* at p. 617, fn. omitted.) Accordingly, "[a]ny chilling effect on the picketing as a form of protest and expression that flows from good-faith enforcement of this valid statute would not, of course, constitute that enforcement an impermissible invasion of protected freedoms. [Citation.]" (*Id.* at p. 619.)

In *Younger*, the statute proscribed criminal syndicalism. (*Younger v. Harris, supra*, 401 U.S. at pp. 38–39.) The court explained that "the existence of a 'chilling effect,' even in the area of First Amendment rights, has never been considered a sufficient basis, in and of itself, for prohibiting state action. Where a statute does not directly abridge free speech, but—while regulating a

---

immunizes conduct from liability for a civil rights violation under the federal statute. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] [failure to support point with reasoned argument and citations to authority deemed waiver].)

[17] This claim reiterates the trial court's findings, in which it cited *Greenwich, supra*, 77 F.3d 26 and found that even if the City's actions "incidentally chilled First Amendment rights," the declaration of Sellars established that "all of [its] adverse actions" were taken "in furtherance of" and "justified by" its "legitimate interest in preserving the personal privacy of its officials . . . ."

subject within the State's power—tends to have the incidental effect of inhibiting First Amendment rights, it is well settled that the statute can be upheld if the effect on speech is minor in relation to the need for control of the conduct and the lack of alternative means for doing so. [Citations.] Just as the incidental 'chilling effect' of such statutes does not automatically render them unconstitutional, so the chilling effect that admittedly can result from the very existence of certain laws on the statute books does not in itself justify prohibiting the State from carrying out the important and necessary task of enforcing these laws against socially harmful conduct that the State believes in good faith to be punishable under its laws and the Constitution." (*Id.* at pp. 51–52.)

We acknowledge that the City has a legitimate interest in protecting the privacy of public officials. However, to further that interest, the City did not condemn tortious or unlawful conduct that is sometimes intertwined with constitutionally protected conduct; nor did its action have only an indirect and incidental chilling effect on the legitimate exercise of First Amendment rights. Rather, in condemning Tichinin, the City directly and intentionally punished ostensibly lawful and arguably protected conduct in order to deter similar conduct in the future. In *Cameron* and *Younger*, moreover, the incidental chilling caused by enforcing the law was justified because enforcing criminal laws is necessary to further the state's interest in preventing crime, if not the primary means of doing so. Here, however, penal and civil statutes and tort law provide ample protection for the privacy of public officials. Thus, we doubt, and the record certainly does not establish, that the City's condemnation of Tichinin's conduct was reasonably necessary to protect privacy rights and thus justified the resulting chilling effect on similar future conduct.

The City's (and trial court's) reliance on *Greenwich, supra*, 77 F.3d 26 is also misplaced. There, a citizens group sued an agency, delaying its plans to construct a solid waste incinerator. The agency counterclaimed against the group, alleging tortious interference with the project and seeking damages caused by the delay. Ultimately both the action and counterclaims were dismissed. Thereafter, the group filed a 1983 action against the agency claiming that its counterclaims were retaliation for their exercise of First Amendment rights. (77 F.3d at pp. 28–29.) On appeal from a judgment for the group, the court held that in 1983 actions based on retaliatory litigation, the plaintiff must prove not only that he or she was engaged in protected conduct and that but for the protected conduct the defendant would not have taken the adverse action but also that the defendant acted with a retaliatory intent to deter the exercise of First Amendment rights. (77 F.3d at pp. 29–31.) Thus, to prevail, the group had to prove that the agency filed counterclaims, "not as a legitimate response to litigation, but as a form of retaliation, with the purpose of deterring the exercise of First Amendment freedoms." (*Id.* at

p. 31, fn. omitted.) Even then, the court explained, the agency could avoid liability by proving that notwithstanding an impermissible motive, it also had legitimate reasons for filing the counterclaims and would have done so for that reason alone. (*Ibid.*)

The *Greenwich* court based its holding on cases imposing state-of-mind requirements on claims under the due process and equal protection clauses and the Eighth Amendment. (*Greenwich, supra*, 77 F.3d at p. 30.) The court noted that in *Waters v. Churchill* (1994) 511 U.S. 661 [128 L.Ed.2d 686, 114 S.Ct. 1878], a plurality of the United Stated Supreme Court held that "under certain circumstances, the State may act adversely with respect to (what turns out to be) protected speech, so long as it does so without any intent to retaliate for the exercise of First Amendment rights." (*Greenwich, supra*, 77 F.3d at p. 31.) The *Greenwich* court also found an intent element implicit in the requirement that a plaintiff prove that an adverse action constituted "retaliation" for protected conduct and also in a defendant's ability to defeat a claim by showing that it also acted solely for a permissible reason. (*Id.* at pp. 32–33.) In addition, the court observed that without an impermissible-intent element, "the filing of counterclaims by a governmental entity would subject that entity to strict liability under section 1983, a result the Supreme Court has rejected." (*Id.* at p. 30.)

The *Greenwich* court's reasoning is persuasive, especially in the context of a retaliatory litigation claim. However, we need not formally decide whether it correctly articulates the plaintiff's burden in *all* cases involving claims of retaliation. Assuming that it applies here, we find that Tichinin's evidence would support a finding that the City acted with an impermissible intent—i.e., that it retaliated against Tichinin for exercising his First Amendment rights in order to deter similar conduct in the future.

Moreover, the Sellars declaration does not establish as a matter of law that the City acted in whole or in part to protect the privacy of public officials. However, even if that was *a* reason for taking action, we do not believe that *Greenwich* would support a defense that the City would have taken the same action only for that permissible reason.

In *Greenwich, supra*, 77 F.3d 26, it was rationally possible to separate proper from improper reasons and thus determine whether the adverse action—the filing of counterclaims—would have been taken regardless of the impermissible reason. As noted, there, the citizens group exercised its rights by filing a lawsuit, and the defendant agency filed counterclaims, which the group later claimed constituted retaliation. Under the circumstances, if, for example, the agency could show that (1) it never threatened the citizens group with counterclaims if it pursued a lawsuit, (2) it did not file its

counterclaims until after it suffered significant, cognizable damages as a result of the group's lawsuit, and (3) its counterclaims were not frivolous, a jury could reasonably find either that the agency did not file the counterclaims with an impermissible retaliatory intent or that the agency would have filed its counterclaims for legitimate legal reasons in the absence of an impermissible intent.

■ Here, however, the City's alleged permissible intent to protect the privacy of public officials and the impermissible intent to retaliate against Tichinin are inseparably intertwined because condemning Tichinin's protected conduct to deter future similar conduct was the very means the City chose to protect the privacy of public officials. Thus, even if a jury found that the City acted to protect the privacy of public officials, we do not believe that a rational jury could also find that it would have taken the same action in the absence of an impermissible intent to punish and deter allegedly protected conduct. This is so even if the City proved that it acted on a good faith belief that Tichinin's conduct was not constitutionally protected. As the court in *Greenwich* acknowledged, good faith is not available to government entities as a defense to liability in 1983 actions. (*Greenwich, supra,* 77 F.3d at p. 30, fn. 4; see *Owen v. City of Independence, supra,* 445 U.S. 622, 638.)

## V. CONCLUSION

■ Having conducted an independent review of the City's anti-SLAPP motion, we find that the City satisfied its initial burden to show that Tichinin's 1983 action is based on conduct that qualifies for protection under the anti-SLAPP statute. In turn, however, Tichinin has satisfied his burden to make a prima facie showing of success on the merits. Specifically, his evidence would support findings that (1) he was engaged in conduct protected by the First Amendment right to petition and right of free speech; (2) the City took adverse action in response to his conduct with the intent to retaliate against him and deter that conduct; and (3) the City's adverse action caused injuries that would deter a person of ordinary firmness from engaging in that conduct. Moreover, the record before us does not conclusively establish any fact that would negate a requisite element of Tichinin's claims or preclude his success on the merits as a matter of law. And last, the trial court's analysis and the City's arguments on appeal do not persuade us otherwise.

In short, Tichinin has demonstrated that his lawsuit is sufficiently viable to survive an anti-SLAPP motion and go forward. (*Wilbanks v. Wolk, supra,* 121 Cal.App.4th at p. 905.) Accordingly, we conclude that the trial court erred in granting the City's motion.

## VI. DISPOSITION

The judgment is reversed. Tichinin is entitled to his costs on appeal. (Cal. Rules of Court, rule 8.278.)

McAdams, J., and Duffy, J., concurred.

Respondent's petition for review by the Supreme Court was denied January 13, 2010, S177501. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.